Ernest BROWN, et al., Plaintiffs,

v.

CITY OF CHICAGO, Defendant.

No. 95 C 1890.

United States District Court,
N.D. Illinois,
Eastern Division.

March 1, 1996.

Lesley A. Redman, Kenneth N. Flaxman, P.C., Kenneth N. Flaxman, Kenneth N. Flaxman, P.C., Chicago, IL, for plaintiffs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GETTLEMAN, District Judge.

This action, having been tried upon the facts by the court without a jury on plaintiff's motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65, the court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. The Plaintiffs And Their Complaint

1. Plaintiffs are 44 African–American or Hispanic members of the Chicago Police Department ("CPD") who hold the career service rank of sergeant and participated in the 1994 lieutenant promotional examination.

2. Plaintiffs have not been promoted to the rank of police lieutenant based on the results of the 1994 police lieutenant examination.

3. On March 28, 1995, plaintiffs filed a complaint in this action challenging the 1994 police lieutenant examination process under 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

4. On December 5, 1995, plaintiffs filed their First Amended Complaint, adding a Title VII disparate impact claim.

5. On February 9, 1996, in open court, plaintiffs abandoned their § 1981 and § 1983 claims.

6. Plaintiffs contend, *inter alia*, that the test has a disparate impact upon African–Americans and Hispanic police sergeants and is an unlawful employment practice under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

7. The 1994 lieutenants' test was completed by 765 police sergeants: 31% of those who took the test were African–American or Hispanic. The City intends to make a total of 108 promotions from the 1994 lieutenant list; less than 6% of these promotions will go to African–American or Hispanic police sergeants.

8. Defendant City of Chicago has to date made 54 promotions from the 1994 promotional roster. 51 of those promoted were white. As the result of these promotions (51 white sergeants and 3 minority sergeants), the percentage of African–American and Hispanic lieutenants has decreased to 19%.

9. The position of lieutenant is the rank form which higher level supervisors in the police department are generally selected.

## B. *The 1994 Police Lieutenant Examination*

10. In 1990, Mayor Richard M. Daley formed a Blue Ribbon Panel, consisting of distinguished members of the law enforcement profession, to make recommendations regarding promotional practices in the CPD.

11. The Blue Ribbon Panel recommended that the City use an outside consultant to design and administer CPD promotional examinations.

12. Consistent with the recommendation from the Mayor's Blue Ribbon Panel that the City use an outside consultant to design and administer CPD promotional examinations, the City retained Barrett & Associates, Inc., to develop and administer the 1994 police lieutenant examination.

13. Barrett & Associates, Inc. ("Barrett"), is a consulting firm that has specialized in the development of employee selection and promotional examinations since 1973.

14. Since 1973, Barrett has developed about a dozen police and fire examinations for municipalities.

15. The test components and the weights of those components were announced to the candidates prior to the administration of the 1994 police lieutenant examination.

16. Barrett agreed to develop a content valid, non-discriminatory CPD lieutenant examination.

17. A content valid test is designed to measure the knowledge, skills and abilities needed to perform the job.

18. The EEOC Uniform Guidelines recognize content validity as an appropriate method of test validation.

19. The initial phase of Barrett's test development included a job analysis to identify the major work behaviors and the related knowledge, skills and abilities ("KSAs") for the job of Chicago police lieutenant.

20. Shortly before Barrett began its job analysis, an organization known as HR Strategies had prepared a job analysis of the position of lieutenant in the CPD. That job analysis also identified various KSAs essential for the lieutenant job.

21. Barrett reviewed and used the HR Strategies job analysis as part of the preparation of its job analysis.

22. Barrett's job analysis consisted of interviews of incumbent lieutenants and other CPD supervisory personnel, ride-alongs, first hand observations of the job of Chicago police lieutenant and a review of all relevant departmental and organizational documents.

23. The culmination of Barrett's interviews, document reviews and ride-alongs was a master job description for the position of police lieutenant that Barrett prepared.

24. Four CPD lieutenants reviewed Barrett's master job description for accuracy and completeness.

25. Once the major work behaviors and responsibilities of the position of a Chicago police lieutenant were identified and their importance and frequency measured, the job analysis interviewers identified the KSAs associated with those major work behaviors.

26. Barrett then linked the job analysis and the job description to the content of the three test battery components: a written job knowledge test, an "in-basket" simulation and an oral briefing exercise.

27. The written job knowledge component was a 150 question multiple choice examination designed to test a candidate's knowledge of CPD General Orders, Special Orders, Illinois Compiled Statutes and Chicago Municipal Ordinances. CPD lieutenants must know the General Orders, Special Orders and Illinois statutory law.

28. The written job knowledge component also tested reading comprehension.

29. In an effort to ensure the relevance and accuracy of the questions on the written job knowledge component, each of the written test questions was reviewed by CPD subject matter experts Chief of Patrol John Cadogan, Lieutenant John Klein, Deputy Chief William Shaw, who is African–American, and Commander Joseph Delopez, who is Latino. Barrett added, deleted or modified test items based on feedback from these CPD subject matter experts. The CPD subject matter experts found that the written job knowledge test was related to the job of police lieutenant.

30. The in-basket component was designed to assess the administrative skills identified as important for the successful performance of the job of Chicago police lieutenant. It involved reviewing documents and answering multiple choice questions. It was designed to closely approximate items that a Chicago police lieutenant might find in an in-basket.

31. CPD subject matter experts Cadogan, Klein, Delopez and Shaw reviewed the in-basket component to ensure relevance and credibility. The CPD subject matter experts found the in-basket component complete and appropriate.

32. The oral briefing exercise was designed to measure those job dimensions identified during the job analysis as vital to successful performance as a Chicago police lieutenant, such as analytical ability and organizational and oral communication skills. It involved reviewing documents and making a speech into a tape recorder. The exercise was designed to simulate a roll call in which the lieutenant candidate had to inform officers about a new gang on the street.

33. Chief Cadogan and Lieutenant Klein reviewed the oral briefing exercise. Barrett made revisions to the oral briefing exercise based on their recommendations.

34. The ability to write clearly and concisely is an important part of the job of lieutenant.

35. The ability to listen to oral communications from other officers and citizens is an important part of the job of lieutenant.

36. The 1994 lieutenant examination did not test directly for listening skills, but did test this skill indirectly by testing reading comprehension.

37. The 1994 lieutenant examination did not test for writing skills.

38. The three components of the 1994 police lieutenant examination were weighted equally.

39. The reading list for the 1994 lieutenant test from which examination questions were drawn was given to all of the candidates prior to the examination.

40. All of the 1994 police lieutenant candidates were given the same examination, regardless of race.

41. Each 1994 police lieutenant candidate's test was scored the same way, regardless of race.

42. The 1994 police lieutenant test scores were combined and weighted in the same manner, regardless of race.

43. A procedure was available for candidates to challenge questions and answers on the 1994 police lieutenant examination, although there was evidence that some candidates may not have been aware of the procedure. There were only four challenges to

the written job knowledge component, one challenge to the in-basket component and a few challenges to the oral component. Barrett and a CPD representative reviewed those challenges and re-keyed portions of the test based on that review.

## C. Attempts To Minimize The Adverse Impact Of The 1994 Lieutenant Examination

44. The 1994 police lieutenant examination had an adverse impact on African–American and Hispanic candidates under the 80% rule of the Equal Employment Opportunity Commission's Uniform Guidelines On Employee Selection Procedures, 29 C.F.R. § 1607.4(d) (1978).

45. White sergeants received 193 of the top 207, 282 of the top 316, and 350 of the top 413 scores on the "job knowledge" component.

46. White sergeants received 181 of the top 203, 271 of the top 313 and 356 of the top 442 scores on the "in basket" component.

47. White sergeants received 171 of the top 195, 303 of the top 383, and 412 of the top 540 scores on the "oral examination" component.

48. White sergeants received 102 of the top 108, 186 of the top 200, 273 of the top 300 and 348 of the top 400 combined scores that comprise the final promotional roster.

49. Barrett took the following steps during the test development process to try to minimize adverse impact: 1) minority CPD lieutenants and supervisors were interviewed during the job analysis; 2) the reading level of the 1994 police lieutenant test was below the reading level of the source material lieutenant candidates read to prepare for the test; and 3) the question writers received diversity training.

50. Barrett also did a computer simulation to see if a different weighting scheme might produce less adverse impact without compromising validity.

51. The results of the hypothetical computer simulation indicated that the number of minority promotions would triple (but would not eliminate the disparate impact) if the oral examination was weighted 60% and the written components were each weighted 20%. These results did not change Barrett's opinion that based on industry standards, Barrett's job analysis and HR Strategies' job analysis the test components should be weighted equally.

52. The City also considered making approximately 80% of the promotions based on the score results of the 1994 police lieutenant examination and 20% of the promotions based on past job performance. The City determined that selecting more than 20% of the promotions based on past performance rather than examination results would have been unreliable.

53. This alternative promotional system would have resulted in the promotion of additional minority sergeants.

54. The City has been unable to make any promotions pursuant to this alternative system because the Appellate Court of Illinois has ruled that Illinois law requires the City to use the results of the Barrett test to make strict rank order promotions as announced to the candidates prior to the examination. *McArdle v. Rodriguez*, 277 Ill. App.3d 365, 213 Ill.Dec. 709, 659 N.E.2d 1356 (1995).

55. The City does not have any empirical evidence to demonstrate that sergeants who score higher on the examination will perform better as lieutenants than those who receive lower scores.

56. There are police sergeants within the CPD who have extremely high potential to be lieutenants but who do not score well on paper and pencil tests.

## D. The April 6, 1995 Lieutenant Promotions

57. The City decided to promote 54 sergeants to the rank of lieutenant based on the results of the examination components Barrett developed.

58. The City also decided to make 13 additional promotions based on past job performance without regard to scores on the Barrett test.

59. An Academic Selection Board, a panel comprised of CPD deputy superintendents and the commander of the training division, reviewed nominations from CPD exempt rank personnel and determined who would be promoted in the group of 13 based on past job performance.

60. The 13 selected for promotion based on past performance included both minorities and non-minorities.

61. On March 20, 1995, Sergeant James McArdle, who is not a plaintiff in this action, filed a lawsuit, *McArdle v. Rodriguez*, No. 95 CH 2498, seeking a preliminary injunction to enjoin the promotion of the 13 lieutenant candidates selected based on past job performance.

62. The Circuit Court of Cook County issued a preliminary injunction, enjoining the City from promoting the 13 candidates selected based on past job performance. The Appellate Court affirmed the issuance of the preliminary injunction. *McArdle v. Rodriguez*, —— Ill.App.3d ——, 213 Ill.Dec. 709, 659 N.E.2d 1356 (1995).

63. Therefore, on April 6, 1995, the City promoted only the 54 candidates based on the rank order results of the 1994 police lieutenant examination. Fifty-one of those promoted were white.

### E. *The Next Round Of Lieutenant Promotions*

64. The City has announced that it plans to promote an additional 54 sergeants to lieutenant. Fifty-one of those sergeants to be promoted are white. These promotions would decrease the percentage of African–American and Hispanic police lieutenants to slightly less than 14%.

65. In January 1996, the City announced that it would make 18 promotions in rank order based on the results of the 1994 police lieutenant examination.

66. The 18 sergeants entered the Training Academy on February 16, 1996, and are scheduled to be promoted to lieutenant on March 8 or March 11, 1996.

### F. *The CPD's Operational Needs And Public Safety*

67. District Law Enforcement, part of the CPD patrol division, is responsible for day to day law enforcement for the City of Chicago. It is comprised of 25 districts located throughout Chicago.

68. Operations in each police district are divided into three eight hour shifts, called "watches." District operations during a watch are supervised by a "watch commander." A watch commander is either a lieutenant or captain.

69. While overall patrol operations for each district are supervised by a watch commander, field operations during each watch are supervised by lieutenants. The CPD needs at least 177 lieutenants to provide adequate supervision for police officers in the field.

70. During the last three weeks of December 1995 and the first week of January 1996, in District Law Enforcement: on the first watch, 68% of the time there was no field lieutenant; on the second watch, 71% of the time there was no field lieutenant; and on the third watch, 74% of the time there was no field lieutenant.

71. In order to provide adequate supervision for patrol operations, District Law Enforcement requires at least 252 captains and lieutenants: 75 watch commanders and 177 field lieutenants. Currently, the division has 215 captains and lieutenants. Thus, District Law Enforcement is short approximately 37 lieutenants.

72. The special functions groups of the CPD patrol division include the public housing division, the public transportation division, the traffic division, and the airport law enforcement division.

73. The special functions groups must have 21 lieutenants in order to be properly staffed. Currently, the special functions groups have only 15 lieutenants. Thus, the special functions groups are short six lieutenants.

74. There also are shortages of lieutenants in the CPD's internal affairs division, the intelligence division, the gang crimes sec-

tion, the detective division and the youth division.

75. Since 1994, the CPD has hired and placed on the street approximately 2,400 new patrol officers.

76. Additional lieutenants are needed to supervise and give direction to the 2,400 new patrol officers in order to provide effective police services.

77. The CPD expects the retirement of at least six lieutenants and captains during the next several months. Additional promotions are necessary to fill those vacancies.

78. The rank of captain is being phased out and no further promotions to that rank will be made.

79. Training for new lieutenants must be concluded without delay so that those supervisors can be deployed in advance of a large number of upcoming events. The following events in Chicago will place an additional burden on the CPD's manpower and require additional supervisory officers:

a. The St. Patrick's Day Parade;

b. The Democratic National Convention;

c. The 150 other special spring and summer events, including concerts, parades and festivals.

80. The Chicago Alternative Policing Strategy ("CAPS") is a recently instituted community-based crime prevention program within the CPD. CAPS is designed to address chronic crime and disorder problems within the City of Chicago.

81. The fact that lieutenants will play a key role in the operations of the CAPS program increases the need for promotions to the rank of lieutenant.

82. The fact that the 1994 police lieutenant examination is in litigation has caused a morale problem, regardless of the result of the preliminary injunction hearing or the outcome of this case.

83. Although the CPD desires a diverse workforce, and is concerned about morale, the overriding operational need for more lieutenants outweighs all other concerns.

## G. Interests Of The Plaintiffs And Other Lieutenant Candidates

84. If the announced promotion of the 18 new lieutenants is not enjoined and plaintiffs ultimately prevail in this litigation and receive promotions, none of those 18 promoted lieutenants would be demoted to make room for plaintiffs, and plaintiffs would not seek the demotion of those 18 lieutenants.

85. Appointments to exempt rank positions (the CPD's executive officers) generally are made from the lieutenant rank. There is no length of time that an officer must serve as a lieutenant before appointment to an exempt position. Not every lieutenant is ultimately promoted to an exempt rank appointment.

86. Some of the African–American and Hispanic officers who are high ranking members of the CPD were promoted to lieutenant as a result of promotional quotas required by previous court decisions. Some of those promoted to lieutenant pursuant to court order were later promoted to exempt rank positions.

87. If plaintiffs prevail in this litigation they may be awarded promotion, back-pay, pension benefits and seniority in title.

88. Any stigma that may occur as a result of court ordered out of rank order promotions would occur regardless of when those promotions are made or whether they are made at the same time as rank order promotions. Although some of plaintiffs' witnesses testified that they experienced difficulties after being promoted to lieutenant as a result of protracted litigation and court order, they also established that lieutenants thus promoted could succeed in the CPD and ultimately be promoted to exempt rank positions as high ranking executive officers.

## II. CONCLUSIONS OF LAW

### H. Preliminary Injunction Standards

1. The court has jurisdiction over the parties and the subject matter of this controversy pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

2. To prevail on a request for a preliminary injunction, the movant has the burden to show, as a threshold matter, (1) some likelihood of succeeding on the merits, and (2) that he or she has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied. *Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1453 (7th Cir.1995); *Storck U.S.A., L.P. v. Farley Candy Co.*, 14 F.3d 311, 313 (7th Cir.1994); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992).

3. If the movant cannot establish some likelihood of success on the merits and irreparable harm, then the court's inquiry ends and the preliminary injunction motion must be denied. *Abbott Labs.*, 971 F.2d at 11.

4. If the movant is able to establish some likelihood of success on the merits and irreparable harm, then the court must balance that showing with the harm to the non-movant and the public if injunctive relief is granted. *Roth*, 57 F.3d at 1453; *Abbott Labs.*, 971 F.2d at 12.

5. The balancing of the equities involves a "sliding scale" approach: the less likely it is that the moving party will succeed on the merits, the stronger must be the showing that the balance of harms weighs in favor of the moving party. *Storck*, 14 F.3d at 313–14; *Abbott Labs.*, 971 F.2d at 12.

### I. *Plaintiffs Cannot Establish Irreparable Harm*

6. The court concludes that plaintiffs will not suffer irreparable harm if the injunction preventing the promotion of 18 sergeants to lieutenant is not granted:

A. The evidence clearly establishes that there are well over 52 (18 promoted plus the 44 plaintiffs) openings for lieutenant in the CPD. Therefore, even if the 18 are promoted now, these plaintiffs can be promoted later;

B. Whatever stigma plaintiffs may suffer (if any) if they are promoted as a result of a court order in this case will result regardless of when such promotion takes place and whether the 18 scheduled promotions are made;

C. Moreover, the evidence clearly establishes that sergeants who have been promoted to lieutenant pursuant to court order have suffered little, if any, lasting stigma. The evidence established that lieutenants promoted as a result of court order have been promoted to exempt rank positions. There was no evidence that any sergeant so promoted was denied or delayed further promotion because of the circumstances surrounding his or her promotion to lieutenant. Therefore, there has been no showing that plaintiffs will suffer any harm that cannot be remedied by a final order in this case should they ultimately prevail. In the event plaintiffs prevail, there is an adequate remedy at law: the court can order their promotion, back pay, pension benefits, and seniority in title. *Ciechon v. City of Chicago*, 634 F.2d 1055, 1058 (7th Cir.1980). Because further promotion to exempt rank is based entirely on merit, not on length of service as a lieutenant, plaintiffs will suffer no other discrimination with respect to their terms, conditions or privileges of employment.

7. Plaintiffs' failure to establish irreparable harm is sufficient, on its own, to deny their motion for preliminary injunction. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992).

### J. *Plaintiffs Cannot Demonstrate A Likelihood Of Success On The Merits Of Their Disparate Impact Title VII Claim*

8. Section 105 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(k)(1)(A), restored the order of proof established by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Under that standard, if a plaintiff establishes that an employee selection device has had a disparate impact, the burden shifts to the employer to demonstrate that the selection device is "job-related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i).

9. If the employer establishes that the selection device is job-related, the burden shifts back to the plaintiff to demonstrate that there was a substantially equally valid alternative selection device with less adverse

impact available and that the employer refused to use it. 42 U.S.C. § 2000e–2(k)(1)(A)(ii); *Officers for Justice v. Civil Service Commission,* 979 F.2d 721, 728 (9th Cir.1992).

■ 10. Because plaintiffs bear the burden in a preliminary injunction motion of demonstrating that they are likely to succeed on the merits, *Cox v. City of Chicago,* 868 F.2d 217, 219 (7th Cir.1989), it is not enough for plaintiffs to establish a *prima facie* disparate impact case in this proceeding. Plaintiffs also must prove some likelihood that defendant will be unable to establish that the 1994 lieutenant examination is not job-related.

11. The 1994 police lieutenant examination has an adverse impact on African–American and Latino candidates under the 80% Rule of the Equal Employment Opportunity Commission's Uniform Guidelines On Employee Selection Procedures, 29 C.F.R. § 1607.4(d) (1978).

■ 12. The evidence presented was insufficient for the court to determine which, if either, party has a greater likelihood of success on the merits. For example, plaintiffs did not establish that the City refused to use a legally available equally valid alternative selection device which would have less adverse impact. 42 U.S.C. § 2000e–2(k)(1)(A)(ii). The City, on the other hand, failed to demonstrate, even for purposes of this preliminary injunction motion, that the test is content valid. *Gillespie v. Wisconsin,* 771 F.2d 1035, 1044 (7th Cir.1985) (a content valid test is job-related under Title VII). It should be noted that plaintiffs presented no expert testimony at the preliminary injunction hearing to support their claim that the test was not content valid or that there existed an equally valid alternative selection device. Questions also remain about the propriety of weighting each component equally. Plaintiffs, of course, as the movants, have the burden to establish at least some likelihood of success. After reviewing the evidence, the court concludes that plaintiffs have established, at best, that they are no more likely to succeed than defendant.

■ 13. Because the likelihood of success on the merits is approximately equal at this stage of the litigation, plaintiffs' failure to establish irreparable harm or an inadequate remedy at law favors denial of their preliminary injunction motion under the sliding scale approach as set forth in *Abbott Labs.,* 971 F.2d at 11.

### K. The Balance of The Harms Weighs Against Granting A Preliminary Injunction

■ 14. Even assuming, *arguendo,* that plaintiffs were able to establish irreparable harm and a likelihood of success on the merits, the City's operational need to promote lieutenants to provide police services to the community in the coming months and to ensure public safety outweighs plaintiffs' private interests. *Roth,* 57 F.3d at 1453 (the harm to the movants must be balanced against the harm to the non-movant and the public). The uncontroverted evidence established that the City has hired approximately 2,400 new police officers in the past two years, and that more lieutenants are needed to provide adequate supervision and training. In addition, the evidence demonstrated that the City's new CAPS program is based on police beat teams that are heavily dependent on supervision from lieutenants.

### L. The Public Interest Weighs Against Granting a Preliminary Injunction.

■ 15. The public interest clearly favors denial of an injunction. The undisputed evidence established that there is an immediate need for the proposed promotions. There are a number of special events planned, including the Democratic National Convention, that will require extensive police services. Although the CPD would manage to service these events in the absence of the proposed promotions, it would be better able to provide needed police services to the public with the additional lieutenants who are scheduled to be promoted.

16. Finally, the court notes the good faith of all parties in this litigation, based upon the evidence presented to date. The admitted disparate impact of the 1994 lieutenants examination on minority sergeants does not

appear to have been intended by the City of Chicago or anyone involved with the design of the examination and the promotion process. To the contrary, the evidence presented at the hearing indicated the disappointment and frustration of the leadership of the CPD with the disparate impact on minorities. Nor should plaintiffs be faulted for presenting their grievances to this court, especially in light of persuasive evidence that a person can succeed admirably as a police lieutenant despite having scored poorly on an examination. The court applauds the CPD's intention to scrap the 1994 examination as soon as possible and to attempt to devise a better way to identify the best candidates for police lieutenant, consistent with state and federal law.

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law, plaintiffs' motion for preliminary injunction is denied. The parties are ordered to prepare a written discovery plan for presentation to the court on April 4, 1996, at 9:30 a.m.