Gordon BARNHILL, Steven Glombicki, Charles McCorkle, Thomas O'Conner, individually and on behalf of all similarly situated plaintiffs, Plaintiffs,

v.

CITY OF CHICAGO, POLICE DEPARTMENT, a municipal corporation, Defendant.

No. 98 C 4807.

United States District Court, N.D. Illinois, Eastern Division.

March 6, 2001.

Pasquale Angelo Fioretto, Catherine Marie Chapman, Jennifer L. Dunitz–Geiringer, Bryan P. Diemer, Baum, Sigman, Auerbach, Pierson, Neuman & Katsaros, Ltd., Thomas J. Pleines, Law Offices of Thomas J. Pleines, Chicago, for Dean C Angelo, plaintiff.

Catherine Marie Chapman, Bryan P. Diemer, Baum, Sigman, Auerbach, Pierson, Neuman & Katsaros, Ltd., Chicago, IL, for Gordon Barnhill, Steven Glombicki, Evangelos Hitiris, Charles McCorkle, Thomas O'Conner, plaintiffs.

Brian L. Crowe, Shefsky, Froelich & Devine, Ltd., Chicago, IL, James Francis Botana, Jackson, Lewis, Schnitzler & Krupman, Chicago, IL, Patrick J. Rocks, Jr., Nancy L. Van Allen, Jay Michael Kertez, City of Chicago, Law Department, Corporation Counsel, Chicago, IL, for City of Chicago, Department of Police, a municipal corporation, defendants.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, District Judge.

In recent years, both minorities and non-minorities have challenged the allegedly discriminatory nature of the Chicago Police Department's ("CPD") promotion process. *See Erwin v. City of Chicago,* No. 90 C 950, 1998 WL 704295, at *6 (N.D.Ill. Sept.30, 1998) ("A review of the history of Chicago Police Department promotional examinations indicates that changes in the exams and procedures are likely; as are continued legal challenges."). As a result, the City of Chicago finds itself wedged between a rock and a hard place- incessantly retooling its examination structure hoping to appease its officers as well as the state and federal courts.

The subject of the latest challenge is the 1998 examination for promotion to the rank of sergeant (the "1998 Sergeant Exam"). In late 1997, the CPD announced that the 1998 Sergeant Exam would consist of three parts: a Written Qualifying Test ("WQT"), a written Assessment Exercise, and a Merit Selection Process (the "Merit Component"). Any officer who achieved a score of at least 147 on the WQT was eligible to (1) take the Assessment Exercise (and, as a result of this score, be placed in rank order on the Assessment Eligible List) and (2) participate

in the Merit Component. The Merit Component itself was a three-part process. First, exempt officers (senior-level executive staff who serve at the pleasure of the Superintendent of Police) nominated eligible patrol officers on the basis of specific job-related assessment dimensions. These nominees were then reviewed by the Academic Selection Board ("ASB"), a panel comprised of CPD deputy superintendents. The ASB then recommended certain of the nominees to Terry Hillard, the Superintendent of Police, who ultimately chose those promoted through this Merit Component.

According to the CPD's 1997 announcement, a maximum of 30% of the resulting promotions were to be based on the Merit Component and the remaining percentage were to be made in rank order from the Assessment Eligible List. In August 1998, the City promoted 251 patrol officers to sergeant as a result of this examination. Of these 251, 178 were promoted in rank order from the Assessment Eligible List, *but see infra note 8,* and 73 were promoted as a result of the Merit Component. Plaintiffs Gordon Barnhill, Steven Glombicki, Charles McCorkle, and Thomas J. O'Connor, all Caucasian males, claim that the City of Chicago committed racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, *et seq.,* and the Equal Protection Clause of the Fourteenth Amendment, by including the Merit Component in the 1998 Sergeant Exam. Plaintiffs allege that the Merit Component was a mask for an illegal affirmative action program and, further, that, as applied, the Merit Component had a disparate impact on "non-minority males." Notably, Plaintiffs have admitted that they did not deserve promotions by virtue of the Merit Component, but nevertheless believe that they have been injured because they would have been promoted in August 1998 if all 251 promotees had been chosen in rank order from the Assessment Eligible List. Both parties now move for summary judgment. For the reasons set forth below, the City's motion is granted and Plaintiffs' motion is denied.

## FACTUAL BACKGROUND [1]

### A.  *United States v. Chicago*

The tortured history of challenges to the CPD's promotion processes stretches back as far as 1971. In 1976, Judge Prentice Marshall of the United States District Court for the Northern District of Illinois

---

1.  The City has moved to strike (Doc. 117–1) a majority of Plaintiffs' LR 56.1 Statement of Uncontested Facts for the following reasons: (1) not supported by the cited record-¶¶ 7, 25, 35, 48, 49, 50, 59, 62, 67, 76, 79.A, 84, 86, 93, 94, 106, 109, 110, 119, 124, 125, 134, 136, 140; (2) failure to provide specific citations to the record-¶¶ 16, 17, 35, 50(a), 60, 79.A, 124; (3) irrelevant-all paragraphs related to (a) the Consent Decree (¶¶ 1–3); (b) the Blue Ribbon Panel Report (draft) (¶¶ 10–11); (c) the Blue Ribbon Panel Report (hiring) (¶¶ 8, 12, 13, 14); (d) Detective Promotions (¶¶ 15–20); (e) Results of Promotions after Blue Ribbon Panel Report (¶¶ 21–22); (f) Written Qualifying Examination (¶¶ 55–61); (g) Assessment Exercise (¶¶ 63–65); (h) Development of the Merit Promotion Process (¶¶ 66–93); (i) Merit Promotion Process (¶¶ 94–114); (j) the Good and Outstanding Lists (¶¶ 115–130); (k) the Superintendent's Decision (¶¶ 131–140); and (*l*) the Second ASB Meeting (¶¶ 141–145); and (4) hearsay-¶¶ 28, 29.

The court notes that Plaintiffs have responded to the first two bases for the City's motion-lack of support for the statements in the cited record and failure to provide specific citations to the record-by supplementing their statement with appropriate citations. *See* Plaintiffs' Corrected 56.1 Statement. These bases are therefore moot. With respect to the City's relevance and hearsay arguments, the court denies the City's motion, but notes that to the extent Plaintiffs' factual assertions are irrelevant or inadmissible as hearsay, they are not considered in this decision.

found that the 1971 Sergeant Exam discriminated against African–Americans, Hispanics, and women in violation of Title VII. *See United States v. Chicago,* 411 F.Supp. 218 (N.D.Ill.1976). Judge Marshall consequently entered a judgment directing the City to:

> [a]dopt and seek to achieve a goal of promoting blacks, Spanish-surnamed persons and females to the rank of sergeant so as to have and maintain a sergeant mix reasonably representative of the patrol force .... To ensure as quickly as practicable the attainment of this goal, 40% of the promotions to the rank of sergeant shall consist of black and Spanish-surnamed persons, subject to the availability of qualified applicants, until further order of this Court.

*Chicago,* 411 F.Supp. at 250–51. In 1981, the Seventh Circuit determined that a sufficient showing was made to justify lowering the court-imposed minority quota to 25%. *See United States v. City of Chicago,* 663 F.2d 1354 (7th Cir.1981). Finally, in 1990, the Seventh Circuit vacated Judge Marshall's equitable decree altogether. *United States v. Chicago,* 897 F.2d 243, 244 (7th Cir.1990) ("Bringing this case to conclusion with the existing parties will cause no injustice. If new events amount to discrimination, the courts remain open to fresh litigation to enforce the right of all to be treated without regard to race, sex, and national origin.").

**B. The Blue Ribbon Panel**

As a result of the *United States v. Chicago* litigation, the City assembled a Blue Ribbon Panel (the "Panel") in or around 1989 to review the City's hiring and promotion processes. (Defendant City of Chicago's Response to Plaintiffs' Rule 56.1 Statement of Uncontested Facts ("City's Response") at ¶ 7.) The City hoped that the Panel's recommendations would help stave off future litigation and public con-

troversy and make the testing process as fair and complete as possible. (City's Response at ¶ 7.) James Holzhauer of the law firm Mayer, Brown & Platt served as Vice Chairman of the Panel. (City's Response at ¶ 4.) Holzhauer, who had represented the City in a wide variety of employment-related matters, coordinated all meetings, and attended the informal hearings where, for example, the Panel conferred with leaders of the Fraternal Order of Police, groups representing African–American, Hispanic, and female police officers, and leaders of the associations representing police sergeants and lieutenants. (Exhibit 3 (Final Panel Report) to Plaintiffs' Statement, at 2; City's Response at ¶ 4; Defendant City of Chicago's Additional Facts at ¶ 62.)

In late 1991 (the record does not indicate the exact date) the Panel issued the final version of its Blue Ribbon Panel on Police Testing, Hiring and Promotion: Report and Recommendations (the "Final Panel Report"). (Plaintiffs' Statement at ¶ 14.) During the discovery phase of this litigation, the City produced an earlier draft of this Panel Report (the "Draft Panel Report"). That earlier draft included a section titled "Recruiting," which announced: "The City is committed to affirmative action and to having a Police Department that is representative of all groups that make up the City of Chicago." (Plaintiffs' Statement at ¶ 10). The Draft Panel Report also included a section entitled "Promotion," which included seven paragraphs. Not one of these paragraphs discussed plans for an affirmative action program. (Exhibit 2 to Plaintiffs' Statement at 10–13.) In the Final Panel Report, the language in the Recruiting section was modified to read, "[t]he City is committed to having a Police Department that is broadly representative of the diverse groups that make up the City of

Chicago." The Final Panel Report also included a Promotion section which again made no reference to affirmative action.

### C. Majeske v. City of Chicago

Despite the Blue Ribbon Panel and its Final Panel Report, litigation over the CPD's promotion processes continued. For example, in 1989, the CPD administered a test to determine which patrol officers it would promote to the rank of detective. *Majeske v. City of Chicago*, 218 F.3d 816, 818 (7th Cir.2000). The test consisted of two components-the first was a written job knowledge multiple-choice test and the second was an oral examination. *Id.* After reviewing the results of the written test, though, the CPD concluded that promoting in rank order based on the results would adversely impact African–American and Hispanic applicants. *Id.*

In its effort to address the adverse impact issue, the CPD devised the following selection method. *Id.* First, it divided all of the candidates into three groups-Caucasian, African–American and Hispanic-and then invited those that scored in the top 17% on the written test in each group (619 overall) to take the oral examination. *Id.* Then, it combined the written and oral scores for these 619 applicants and used these combined scores to create a promotion eligibility list. *Id.* at 819. In August 1990, the CPD promoted 64 officers from this list. *Id.* The top 42 people on the list were promoted in rank order, but the other 22 promotions were made out of rank order and were awarded to the 18 highest scoring African–American and 4 highest scoring Hispanic candidates. *Id.*

Second, in addition to these 64 promotions, the CPD decided to promote 26 patrol officers based solely on merit. *Id.* The CPD's process for choosing these merit promotees was similar to the 1998 Sergeant Exam's Merit Component that Plaintiffs challenge in this case. Individual exempt unit commanders were asked to submit names of the employees under their command whom they considered to be superior performers. Once a list of these candidates was compiled, the Superintendent himself selected 26 from that list by considering their performance, absenteeism, disciplinary records, and commendations. *See Majeske v. City of Chicago*, No. 89 C 7262, 1998 WL 312016, at *1 (N.D.Ill. June 4, 1998).

Later in 1990, the Fraternal Order of Police filed grievances on behalf of non-minority patrol officers who had not been promoted, claiming that the out-of-rank and merit promotions violated the collective bargaining agreement between the CPD and the FOP. On October 31, 1991, the arbitrator, Anthony Sinicropi, found that the out-of-rank detective promotions did violate the CBA, but the merit promotions did not. *Id.* at 819. Then, eighty-three Caucasian police officers who sought and did not receive promotions to detective filed an action in federal court against the City claiming that the out-of-rank promotions (but not the merit promotions) violated their equal protection rights under the Fourteenth Amendment. The City stipulated that race and national origin were factors in the promotions resulting from the 1989 detective test, but argued that the CPD's affirmative action plan was nevertheless constitutional. *Id.* at 819. A jury found in the City's favor and the Seventh Circuit affirmed the verdict. *Id.* at 825.

### D. Brown v. City of Chicago

The controversy over merit promotions in particular was renewed as a result of the CPD's 1994 examination for promotion to the rank of lieutenant (the "1994 Lieutenant Exam"). *See Brown v. City of Chicago*, 917 F.Supp. 577 (N.D.Ill.1996)

("*Brown I*"). The 1994 Lieutenant Exam originally consisted of three subtests: a written job knowledge test, an "in-basket simulation" (designed to closely approximate items that a Chicago police lieutenant might find in an in-basket), and an oral briefing exercise. *Id.* at 580. Scores on each component were combined to produce a final score. *Id.* As with the 1989 detective exam, when the CPD received the scores, it determined that the test had an adverse impact on minority applicants. *Id.* at 1111. In an attempt to minimize this adverse impact, the City developed an alternative promotion system where: "80% of the promotions [were to be] based on the score results of the 1994 police lieutenant examination and 20% of the promotions [were to be] based on past job performance." *Id.* at 581. The City decided not to use this alternative, however, after the Illinois Appellate Court ruled that the City lacked authority under the Municipal Code to make merit promotions.[2] *See McArdle v. Rodriguez,* 277 Ill.App.3d 365, 213 Ill.Dec. 709, 659 N.E.2d 1356 (Ill.App.1st Dist.1995) (*cited in Brown I,* 917 F.Supp. at 581).

As soon as the City decided to drop the merit alternative, forty-four African-American and Hispanic members of the CPD filed a Title VII action and sought a preliminary injunction to prevent the CPD from making the rank order promotions. *See Brown I,* 917 F.Supp. at 586. The court denied the plaintiffs' preliminary injunction request, *see id.,* but, in 1998, resolved the merits in the plaintiffs' favor. *See Brown v. City of Chicago,* 8 F.Supp.2d 1095 (N.D.Ill.1998) ("*Brown II* "). In *Brown II,* the court acknowledged that "the [1994 Exam], including each of its three components [was] content valid[3] because it measure[d] a significant portion of the knowledge, skill and abilities of a Chicago police lieutenant," *id.* at 1110, but nevertheless held that the City had violated Title VII because it had refused to implement the merit promotions-an available, equally valid, less discriminatory method for promotion. The fact that the Illinois Appellate Court had enjoined the

---

**2.** Notably, four years later, the same district Illinois Appellate Court found that the City's Personnel Rules, amended in October 1997, explicitly allow it to consider merit as a basis for making promotions. *See Nolan v. Hillard,* 309 Ill.App.3d 129, 242 Ill.Dec. 952, 722 N.E.2d 736 (1st Dist.1999) (citing Personnel Rules, City of Chicago, Rule X, § 1 (October 14, 1997); Personnel Rules, City of Chicago, Notes on Amendments (October 14, 1997)) (stating that section one of Rule X was revised to provide for eligibility lists "in order to permit their use for merit appointments."). In *Nolan,* the FOP, on behalf of William Jaconetti and other Chicago police officers, sought to enjoin the City from administering the 1998 Sergeant Examination because its announced process was contrary to the City's Personnel Rules and therefore in violation of state law. *Id.* at 133, 242 Ill.Dec. 952, 722 N.E.2d at 740. Specifically, the plaintiffs claimed that the Personnel Rules did not allow the City to consider an applicant's "merit" in the decision-making process. *Id.* While the *Nolan* court noted that Jaconetti did not have standing to challenge the merit component, it stated further that "assuming Jaconetti did have standing, his challenge would fail in light of the express language contained in section 1 of Rule X, which explicitly allows [Department of Personnel] to consider merit as a basis for making promotions." *Id.* at 309 Ill.App.3d at 141, 242 Ill.Dec. 952, 722 N.E.2d at 746.

**3.** Content validity is one of the types of validation recognized by the American Psychological Association in its "Standards for Educational and Psychological Tests and Manuals." *See Chicago Fire Fighters Union Local No. 2 v. City of Chicago,* Nos. 87 C 7295, 89 C 7984, 93 C 5438, 93 C 6175, 96 C 808, 1999 WL 1289125, at *12 (N.D.Ill.Dec.30, 1999). According to the APA Standards, content validity is achieved by developing test items that sample critical knowledge, skills and abilities present in the job domain under review. *Id.*

use of merit selection was irrelevant, the court stated, because by passing the Civil Rights Act of 1964, "Congress intended to supersede all provisions of State law which require or permit the performance of an act which can be determined to constitute an unlawful employment practice under the terms of Title VII of the Act or are inconsistent with any of its purposes." [4] *Id.* at 1112.

The plaintiffs then appealed the aspect of the *Brown II* decision that found the 1994 Lieutenant Exam to be content valid. The Seventh Circuit affirmed the decision of the district court. *See Bryant v. City of Chicago,* 200 F.3d 1092 (7th Cir.2000). In its decision, the court stated that:

> The City did not appeal [the finding that the merit promotions were an equally valid, less discriminatory alternative], so we need not pass on the validity of the merit promotion method, but we note that the parties agree as to the value of the merit method despite the fact that it includes a subjective element which minorities often find objectionable.

*Id.* at 1099.

### E. *Adams v. City of Chicago*

Whereas the CPD utilized a merit selection process for promotions to detective in or around 1990, and to lieutenant in or around 1994, it did not consider a merit selection process for promotions to sergeant until around 1997. This was a result of a challenge to its 1994 Sergeant Exam. The 1994 Sergeant Exam was comprised of three parts. Part I contained multiple-choice questions covering the law, department procedures, and other regulations. *See Adams v. City of Chicago,* 135 F.3d 1150, 1152 (7th Cir.1998). Part II (also multiple-choice) tested the administrative functions performed by sergeants, including reviewing reports and determining crime patterns. *Id.* Candidates who performed well on Parts I and II were eligible to take Part III, an oral examination based on a written briefing. *Id.* Before administering the 1994 Sergeant Exam, the CPD announced that promotions would be based exclusively on the results of the test and made in rank order. *Id.*

Of the original 4,700 patrol officers who took the examination, 56.4% were Caucasian, 31.8% were African–American, and 10.8% were Hispanic. *Id.* After all three parts were graded, though, about 88% of those designated to be promoted to sergeant were Caucasian and 12% were minorities. *Id.* In August 1994, the CPD prepared to promote 114 officers to sergeant based on the 1994 Sergeant Exam; but only 6 of these officers were minority group members. (Exhibit 8 to Plaintiffs' Statement–February 17, 1995 Letter from James Holzhauer to members of the Blue Ribbon Panel.) As a result, approximately 280 minority patrol officers filed suit claiming violations of, *inter alia,* Title VII and the Fourteenth Amendment, and sought a preliminary injunction prohibiting the CPD from making rank order promotions during the pendency of the case. *Id.* at 1153. The court denied the preliminary injunction. *Id.* The plaintiffs then appealed, and, on April 23, 1996, during the pendency of the interlocutory appeal, the City initiated a Task Force to again review the CPD's promotion practices. *Id.* As described further below, *see infra,* Factual Background, Section F., the Task Force issued a report in January 1997 recom-

---

**4.** In a later opinion, the court "order[ed] the City to promote with all deliberate speed the 13 sergeants chosen for merit promotion in 1995 to the rank of lieutenant, and to award them back pay consisting of the differential between their sergeant's pay and their lieutenant's pay, dating back to April 1995 when they had been scheduled to be promoted." *See Brown v. City of Chicago,* 19 F.Supp.2d 890, 892 (N.D.Ill.1998).

mending that up to 30% of the CPD's promotions to sergeant be made on the basis of "merit." *Id.* The Seventh Circuit upheld the district court's denial of the preliminary injunction request, but stated:

> At oral argument attorneys for both sides indicated that the City is indeed giving serious consideration to a merit promotion procedure recommended by the appointed Task Force. Any such resolution achieved in a forum that does not resort to federal court is most welcome.

*Id.* at 1155.

## F. The Task Force

As described above, during the pendency of *Adams v. City of Chicago*, the City established the Chicago Police Department Promotion and Testing Task Force (the "Task Force"). One of its primary goals was to ensure that the promotional process was fair. The Task Force also subscribed to the idea that the CPD should reflect the diversity of the community. (City's Response at ¶ 23.) Holzhauer, who had served as Vice–Chairman of the Blue Ribbon Panel, served as Chairman of the Task Force. (City's Response at ¶ 24.) He testified in his deposition that the Task Force met approximately ten times to prepare its recommendation. (City's Response at ¶ 24.) The Task Force was aware that prior exams, such as the one at issue in *Adams*, had an adverse impact on minorities, and obviously considered this fact when making its recommendations for future exams. (City's Response ¶ 35.)

On June 19, 1996, the Task Force held an open meeting at the Palmer House Hilton in Chicago so that interested individuals could testify before it. (City's Response at ¶ 27.) Vance Kimber, President of The Guardians, an African–American patrolmen's association, appeared at that meeting. Kimber advocated a merit selection component and recommended that:

> The criteria for merit promotions should be a pre stated job performance and should also consider a myriad of attributes that can be measured and scored for each promotion. For example: out of 100% taking the exam, 80% of the applicants would be promoted based on test scores, and the remaining 20% would be promoted based on merit; of the merit 20%–20% would reflect ethnic and gender deficits in the rank in which the exam is given. This makes it a promotion based on merit and not a minority promotion because any ethnic[ity or] gender that has a deficit will be addressed . . . .

(Plaintiffs' Statement at ¶ 28.) Two weeks later, Alderman Barbara Holt presented a statement before the Task Force, asking the Task Force to help the City take a "giant step forward in the handling of hiring and promotion in order to achieve greater diversity and the equitable representation of people of color and women in the ranks of our Police and Fire Departments."[5] (Plaintiff's Response to Defendant City of Chicago's Rule 56.1 Statement of Uncontested Facts ("Plaintiffs' Response") at ¶ 29.)

---

5. The City has objected to, and asked the court to strike, the comments of Vance Kimber and Alderman Holt on hearsay grounds. The court finds, however, that these comments are not being offered for the truth of the matter asserted therein, but rather to demonstrate the City's awareness and consideration of the community's desire for a di-

verse police force at the time it was developing the 1998 Sergeant Exam. (Exhibit 13 (Task Force Report) to Plaintiffs' Statement ("The task force carefully weighed and considered all testimony as it developed its recommendations.")). The comments will be considered for this purpose.

On January 17, 1997, the Task Force published its "Police Department Promotion and Task Force Report" (the "Task Force Report"). (Plaintiffs' Statement at ¶ 32.) The Task Force recommended that, "[f]or each round of promotions, at least seventy percent (70%) of the officers selected for further screening should be selected based on score on [a] qualifying examination and up to thirty percent (30%) should be selected on the basis of merit." (Ex. 13 to Plaintiffs' Statement at 8.) The Task Force recommended a percentage of no more than 30% based in part on testimony that 20% had been successful in the 1989 promotion of detectives. (City's Response ¶ 36.) In fact, on the day the Task Force released its report, the Mayor's office issued a press release stating:

> [t]he Task Force recommends that up to 30 percent of future promotions to the[ ] ranks [of sergeant and lieutenant] be made on the basis of superior ability, responsibility and dedication to police service. This proposal is also designed to identify members of the Chicago Police Department with supervisory potential who may not perform well on written promotional examinations. *The merit promotion process would be structured similar to the process currently in place for promoting detectives.*

(Plaintiffs' Statement at ¶ 43) (emphasis added).

### G. The 1998 Sergeants' Examination

#### 1. The Development of the Exam

At some point in early 1996, Robert Joyce, Deputy Commissioner of the City of Chicago, Department of Personnel, initiated discussions with the CPD and City officials regarding another sergeants' examination. (*Id.* at ¶ 45.) Adrienne Bryant, of the Mayor's Office, then contacted Dr. Morton McPhail, a testing consultant at Jeanneret & Associates, about developing such an examination. (*Id.* at ¶ 47.) On July 29, 1997, the City and Jeanneret entered into a formal contract. (City's Response at ¶ 48.) The ultimate structure of the 1998 Sergeant Exam was announced on October 20, 1997, and again on November 4, 1997, by the City's Department of Personnel. (Plaintiffs' Statement at ¶ 53.) It consisted of a Written Qualifying Test ("WQT"), a written Assessment Exercise, and the Merit Component. (Defendant City of Chicago's Federal Rule 56 Statement of Undisputed Facts ("City's Statement") at ¶ 2.) According to the announcements, "[a]pplicants who pass the written qualifying test will be placed on the Merit Selection Eligible List. Merit promotions will be determined by the Superintendent of Police from lists of nominees compiled by the Merit Promotion Nominating Committee and recommended by the Police Department's Academic Selection Board." (Exhibit W to City's Statement.) The announcements further stated that "[p]romotions from the Merit Selection Eligible List will not exceed 30 percent of the promotions made from this examination." (*Id.*)

#### 2. The Written Qualifying Test

On January 10, 1998, approximately 3,201 CPD patrol officers sat for the WQT (Plaintiffs' Statement at ¶ 55), which was designed to evaluate relevant knowledge domains and their applications in the sergeant position. (Plaintiffs' Statement at ¶ 3.) Of the 3,201 candidates, 2,682 passed the WQT by achieving a score of at least 147. (Plaintiffs' Statement at ¶ 56.) The following is a breakdown of the WQT performance by race:

| Subgroup | All Candidates | Candidates Passing | Percentage |
|---|---|---|---|
| Caucasian | 1,672 | 1,518 | 90.8 |
| African–American | 1,074 | 787 | 73.3 |
| Hispanic | 414 | 340 | 82.1 |
| Asian/Other | 41 | 37 | 90.2 |

(Exhibit 8 to City's Statement at 40.) In order to establish the 147 cutoff score, subject matter experts ("SMEs") used two approaches-the Angoff and the Nedelsky methods.[6] (City's Response at ¶ 57.) Dr. McPhail then combined the data from these two approaches to obtain a qualifying score, and then adjusted this qualifying score by one standard of measurement[7] to reduce the statistical risk of causing a false negative classification. (City's Response at ¶ 57.)

Plaintiffs were among the 2,682 candidates who achieved a score of 147 or higher, and thus became automatically eligible to (a) take the written Assessment Exercise and (b) participate in the Merit Component. (City's Statement at ¶ 4.)

### 3. Assessment Exercise

On April 4, 1998, approximately three months after the WQT, the 2,682 patrol officers who passed the WQT took the Assessment Exercise. (City's Response at ¶ 63.) Plaintiffs have admitted that the Assessment Exercise was content valid. (City's Response at ¶ 64.) The Assessment Exercise was scored, and the candidates were placed in rank order on the Assessment Eligible List. (City's Statement at ¶ 5.) Plaintiffs' rankings on the Assessment Eligible List were as follows: Barnhill–266; Glombicki–297; McCorkle–261; and O'Connor–274.[8] (Exhibit R (Assessment Eligible List) to City's Statement.)

6. According to the Development of a Promotional Examination Process for the Rank of Sergeant Report drafted by Jeanneret & Associates, Inc. (the "Test Development Report") (Exhibit 8 to the City's Statement), Angoff's method (1971) requires SMEs to estimate the probability that a minimally competent individual would answer each individual test item correctly, and Nedelsky's method (1954) requires SMEs to identify the number of distractors a minimally competent individual could eliminate as clearly incorrect. (*Id.* at 36–37.) Moreover, the report continues, "empirical results suggest that the Angoff method may overestimate scores empirically derived from other techniques, while the Nedelsky method frequently provides a substantially lower estimate. A combination of methods ... may maximize the reasonableness of the qualifying score established." (*Id.* at 38.)

7. The Standard Error of Measurement used by Dr. McPhail was equal to the standard deviation of the WQT multiplied by one minus the reliability of the WQT. Dr. McPhail determined that the standard deviation of the WQT was 18.12 and the reliability was .86. These values yielded a Standard Error of Measurement of 6.65 points. (Test Development Report at 39.)

8. As noted above, in August 1998, the City promoted 178 officers from the Assessment Eligible List. While the City sought to promote these officers in rank order, certain officers were passed over for their failure to meet educational or other requirements. Consequently, instead of the 178th ranked officer, the last officer promoted by way of the Assessment Eligible List was ranked 236th. Plaintiffs have alleged that, given their ranks of 261, 266, 274, and 297, they would have been promoted in August 1998 if the 73 "merit" promotions had occurred by way of the Assessment Eligible List. The City has conceded this point (Answer, ¶¶ 5, 7, 9, 11) and the court accepts this concession.

#### 4. The Three–Step Merit Selection Component

As the Task Force report had recommended, though, the CPD only utilized the Assessment Eligible List to make a portion-as it turned out, 70%-of its promotions to sergeant. The remaining 30% of the promotions were based upon the Merit Component. The Merit Component proceeded as follows:

##### a. Step 1–The Nominators

In its first step, exempt members of the CPD (the "Nominators"), chosen by the Superintendent of Police, nominated individual patrol officers on the basis of specific job-related assessment dimensions. (City's Statement at ¶ 12.) According to the testimony of Dr. McPhail, "the assessment dimensions represent[ed] critical components of the skills, abilities and personal characteristics required for the sergeant position that supplement the requirements assessed by the written qualifying examination and assessment exercise." (Plaintiffs' Response at ¶ 20.) Dr. McPhail trained each of the Nominators for two hours, and cautioned them, both verbally and in writing, to avoid bias and stereotypes in making their nominations. (City's Statement at ¶¶ 12, 21; Plaintiffs' Response at ¶ 12; City's Response at ¶ 69b.) During these training sessions, the Nominators were provided with a summary of the Merit Component, specification of their responsibilities, detailed definitions and descriptions of assessment errors, examples of behavior descriptions, instructions for completing the nomination forms, and a sample completed form. (Plaintiffs' Statement at ¶ 69a.) The Nominators then made their nominations and submitted them to the ASB. (City's Statement at ¶ 13.) Altogether, there were approximately 300 nominations. (Exhibit 34 to Plaintiffs' Statement at 73.) Notably, Plaintiffs have admitted that no specific Nominator used race as a factor in deciding whom to nominate for consideration by the ASB; yet, none of the four named Plaintiffs was nominated to the ASB. (City's Statement at ¶ 38; Plaintiffs' Response at ¶ 37.)

##### b. Step 2–The Academic Selection Board

The ASB review marked the second stage of the Merit Component. The members of the ASB were First Deputy Superintendent John Townsend, Deputy Superintendent Mike Malone, Deputy Superintendent John Harris, Acting Deputy Superintendent Richard Wedgbury, Deputy Superintendent Charlie Roberts, and Deputy Superintendent John Whigham. (City's Response ¶ 80.) Robert Joyce served as a facilitator. (*Id.*) In their respective depositions, certain of the ASB members testified about the importance of diversity in the supervising ranks. (City's Response ¶ 81, 90.) For example, Harris testified that "the importance of a diverse police force reflecting the city in which it serves cannot be understated." (City's Response ¶ 81.) And Whigham, in his deposition, agreed with the following statement: "The department can effectively police the city only if it can maintain the confidence of all segments of the population. This, in turn, requires some efforts to ensure that the department reflects the city's diversity." (Whigam Dep. at 67; City's Response ¶ 93.) Unlike the Nominators, the members of the ASB were not required to attend any of Dr. McPhail's training sessions (although Harris and Roberts did attend one of McPhail's sessions). (McPhail Dep. at 204; City's Response at ¶ 74.)

In early June 1998, before the ASB met to discuss the nominees, Lieutenant Edmund Kantor sent the ASB members the

"1998 Meritorious Sergeants List." This included (1) each candidate's nomination form with attachments; (2) a roster which listed all of the nominees alphabetically and included information such as each nominee's race, sex, commendations, disciplinary history, educational achievements, and the name of the Nominator who had recommended the candidate (the "Meritorious Sergeant Nominee Profile"); and (3) a list entitled "Female and Minority Nominees for Merit Sergeant Positions." [9] (Plaintiffs' Statement at ¶ 107; City's Response at ¶¶ 99, 103.)

At the ASB meeting, Whigham and Harris read all of the nominations aloud. The ASB members discussed each nominee's dimensions, assignments, leadership, and mentoring abilities. (Plaintiffs' Statement at ¶ 108.) The ASB members then separated the nominees into three categories—"outstanding," "good," and "not recommended." (Plaintiffs' Statement at ¶ 109; Plaintiffs' Response at ¶ 15.) Townsend testified that race was not discussed at this ASB meeting. (Exhibit E (Townsend Dep.) to City's Statement, at 146.) After the meeting, though, Joyce and Wedgbury, on their own initiative, tallied the race and gender of those in the "outstanding" and "good" categories to get an idea of the numbers being forwarded to Superintendent Hillard. (Plaintiffs' Statement at ¶¶ 113, 120.)

In the second week of July 1998, Townsend submitted 146 of the nominations along with two lists-the "1998 Meritorious Sergeants Outstanding Nomination Selections by the Academic Selection Board" (84 names–48 Caucasians; 25 African-Americans; 10 Hispanics; 1 Other) and the "1998 Meritorious Sergeants Good Nomination Selections by the Academic Selection Board" (62 names–41 Caucasians; 12 African–Americans; and 9 Hispanics)-to Superintendent Hillard for his review and consideration. [10] (Plaintiffs' Statement at ¶ 121.) Each of the two lists included only the candidate's sex, race and unit of assignment. (Plaintiffs' Statement at ¶¶ 115, 116.) The City contends that demographic data, including race, is always available on CPD forms. (City's Statement at ¶ 44.) Plaintiffs disagree and they, along with Plaintiffs' expert witness, Dr. Elliot Cramer, claim that this unnecessary information destroyed the validity of the entire Merit Component. (Plaintiffs' Additional Facts at ¶ 5.)

### c. Step 3–The Superintendent

In what marked the third and final step of the Merit Component, Hillard considered the materials submitted to him and also independently evaluated the nominees' past work experience, looking at assignments, number of honorable mentions and commendations, education level, language skills, and ability to make judgment calls. (Plaintiffs' Statement at ¶ 138.) Hillard, who, like most of the ASB members, did

---

9. For a reason of which the court is not aware, the City "elect[ed] not to respond" to the Plaintiffs' statement of fact indicating the existence of this "Female and Minority Nominees for Merit Sergeant Positions" list. (Defendants' Response at ¶ 107.) The City actually chose this tack quite often in its Response. The court has consequently performed an independent review of the relevant statements and includes those it found to be both relevant and accurate.

10. Hillard had been promoted to the rank of lieutenant in 1990. In early 1998, after the 1998 Sergeant Exam was underway, Hillard became Superintendent of Police. Hillard testified at his deposition that he personally believes there should be greater diversity in the CPD's supervisory ranks, but also that the City should seek the most competent and qualified persons to fill these spots. (Plaintiffs' Statement at ¶ 129; City's Response at ¶ 129.)

not attend one of Dr. McPhail's training sessions, then informed Townsend of his selections. (Plaintiffs' Statement at ¶ 139.) In his deposition, Superintendent Hillard testified that "when [he] was going through [his] selection, race nor gender played a part in it.... The most competent, the most qualified person should get those jobs, and it was a judgment call on [his] part." (Exhibit G (Hillard Dep.) to City's Statement, at 165.)

The ASB reconvened at Hillard's request, however, in order to consider candidates from the 3rd, 15th, and 23rd Districts because no candidates had been nominated from those areas. (Plaintiffs' Statement at ¶ 141.) The ASB added for Hillard's consideration two candidates-David Villalobos, from the 23rd District, and Tony Brown, from the 15th District. Officer Villalobos is Hispanic and Officer Tony Brown is African–American. The ASB obtained these two candidates by going back through the candidates who were previously "not recommended." Villalobos ranked 422 and Brown ranked 2,434 on the Assessment Exercise. (Plaintiffs' Statement at ¶ 143.)

On July 16, 1998, the City issued an announcement directing 251 patrol officers (including Brown and Villalobos) to report for pre-service sergeant training commencing on July 20, 1998 and lasting until approximately August 7, 1998. (Defendant City of Chicago's Answer to Plaintiffs' Fourth Amended Complaint at ¶ 20.) The racial composition of those selected was: 72% Caucasian; 19% African–American; 8% Hispanic; and 1% Asian–American. (City's Statement at ¶ 9.) Of these 251 candidates, 178 were promoted based on their rank on the Assessment Eligible List, and the remaining 73 candidates were promoted through the Merit Component. (City's Statement at. ¶¶ 7, 8.) In other words, Superintendent Hillard chose 73 of the 148 nominees that were forwarded to him. He chose 40 of the 89 Caucasians (44.9%), 23 of the 38 African–Americans (60.5%), 9 of the 20 Hispanics (45%), and the 1 Asian–American (100%). The racial composition of these 73 merit promotees was: 54.79% Caucasian (40 promotees); 31.5% African–American (23 promotees); 12.32% Hispanic (9 promotees); and 1.39% Asian–American (1 promotee). (City's Statement at ¶ 10.) As noted above, the City has stipulated that Plaintiffs were among the 73 officers who would have been promoted from the Assessment Eligible List but for the Merit Component. (City's Statement at ¶ 36; *supra* note 8.)

These numbers have been evaluated by the parties' respective experts. In his "Evaluation of the Meritorious Selection Process for Sergeants in the Chicago Police Department" (Exhibit 42 to Plaintiffs' Statement), Plaintiffs' expert, Dr. Cramer, contends that the last stage, but only the last stage, of the Merit Component caused an adverse impact against Caucasians. He emphasizes Superintendent Hillard's choosing 60.5% of the African–Americans submitted to him by the ASB and only 44.9% of the Caucasians (the selection rate for Caucasians being 74% that of the rate for African–Americans). Dr. Cramer performed a "one-tailed" Fisher's exact test on these numbers and obtained a "p-value" of .078. (City's Statement at ¶¶ 50, 51.) The p-value is a statistical measure of confidence that the contested results were not due to chance. (City's Statement at ¶ 52.) Dr. Cramer admitted during his deposition that the generally accepted research standard for statistical significance is .05. (City's Statement at ¶ 54.)

In response to Dr. Cramer's results, the City's expert, Dr. McPhail, conducted an analysis of his own. (Exhibit 25 to Plaintiffs' Statement.) Dr. McPhail agreed with Dr. Cramer's "one-tailed" calculation

of the p-value, but then calculated the p-value of Hillard's selection using a "two-tailed" condition. This resulted in a p-value of .124 (i.e., the observed outcome or one more extreme could be expected to occur more than 12% of the time under conditions of race-neutral selection).[11] (*Id.* at 19.) Then, Dr. McPhail determined that the corrected "z-value" for African–American nominees appointed by Superintendent Hillard was 1.409. (City's Statement at ¶ 58.) The z-value is the "number of standard deviations between the actual and expected figures." *See EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 323 n. 20 (7th Cir.1988). A z-value *greater* than 1.96 standard deviations is ordinarily required to support a finding of adverse impact. *See Moore v. Summers,* 113 F.Supp.2d 5, 20 (D.D.C.2000). *See also Mozee v. American Commercial Marine Serv. Co.,* 940 F.2d 1036, 1043 (7th Cir. 1991) (noting that 1.96 standard deviations is the threshold for statistical significance).

## H. Procedural History

On August 4, 1998, Dean Angelo filed a verified complaint alleging that the City had violated his equal protection rights under the Fourteenth Amendment by discriminating against him on the basis of race. (City's Statement at ¶ 23.) That same day, Angelo filed a petition for a temporary restraining order ("TRO") seeking to prevent the City from going forward with its August 7 promotions. (*Id.*) Judge Suzanne Conlon denied Angelo's TRO petition and questioned his standing to bring the lawsuit after learning that his rank on the Assessment Eligible List was 637. (*Id.* at ¶ 24.) Shortly thereafter, Angelo filed a First Amended Complaint,

alleging that "because of the City's affirmative action promotions, non-minority officers, such as Dean Angelo, are denied the opportunity to be promoted despite their superior test scores *and* more meritorious records." (*Id.* at ¶ 26.)

On September 18, 1998, Angelo again amended his complaint, adding five additional plaintiffs: Barnhill, Glombicki, McCorkle, O'Connor, and Evangelos Hitiris ("Second Amended Complaint"). (*Id.* at ¶ 27.) These additional five named plaintiffs, unlike Angelo, had scores on the Assessment Exercise which would have resulted in their promotion to sergeant if the City had made promotions solely on the basis of Assessment Exercise scores. (*Id.*; *see supra* note 8) The Second Amended Complaint again alleged that the City had violated the plaintiffs' rights under the Fourteenth Amendment by using the Merit Component to promote members of racial and ethnic minorities and that the City used the Merit Component to promote candidates with "less meritorious records than Plaintiffs." (*Id.*)

On December 16, 1998, the court granted the plaintiffs leave to file their Third Amended Complaint. In this Third Amended Complaint, which dropped both Angelo and Hitiris as plaintiffs, Plaintiffs Barnhill, Glombicki, McCorkle, and O'Connor admitted that they would not have been selected as part of the Merit Component, but maintained that the Merit Component should not have been used at all. (*Id.* at ¶ 28.) Plaintiffs also added a second count which alleged gender discrimination (against males) in violation of Title VII. (*Id.* at ¶ 31.) On March 23, 1999, Plaintiffs moved for leave to file their

---

11. Dr. Cramer admitted that this was approximately the result he obtained when he ran a two-tailed test, but testified that a p-value of either .078 or .124 is nevertheless statistically significant under these circumstances because the ASB members and Superintendent Hillard had racial information available to them when making their decisions. (Plaintiffs' Response at ¶ 51.)

Fourth Amended Complaint. In Count I, Plaintiffs alleged that the City violated the Fourteenth Amendment by promoting candidates based on their race and ethnicity. (*Id.* at ¶ 32.) Plaintiffs abandoned the gender discrimination claim they had alleged in their Third Amended Complaint, and, in Count II, now claim that the Merit Component had a disparate impact on Caucasian males because more Caucasian males would have been promoted as a result of selections based solely on the written Assessment Exercise. The court granted Plaintiffs leave to file this Fourth Amended Complaint on April 21, 1999. (*Id.* at ¶ 34.) As a condition of this order, though, the court dismissed with prejudice all claims brought by the plaintiffs in their previous four complaints, including any claim that they should have been promoted on the basis of merit. (*Id.*) [12]

On June 20, 1999, Plaintiffs were each promoted to the rank of sergeant. (City's Statement at ¶ 1.) These Plaintiffs have not received any pay differential between the patrol officer and sergeant ranks for the period between August 1998 and the date they were ultimately promoted, nor have they received retroactive seniority. (O'Connor Aff.; McCorkle Aff.; Barnhill Aff.; Glombicki Aff.) On June 29, 2000, both parties moved for summary judgment.

## DISCUSSION

### A. Standing

■ Before reaching the merits of the parties' summary judgment motions, the court must first determine whether Plaintiffs have standing to bring this suit in federal court. To have standing, the Supreme Court has explained, the plaintiff must allege (1) that he has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision. *See Books v. City of Elkhart,* 235 F.3d 292, 298–99 (7th Cir.2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Here, the City contends that Plaintiffs fail to satisfy this critical jurisdictional requirement because there is no causal relationship between Plaintiffs' failure to receive a promotion and the City's alleged use of racial factors in making its merit selections. The court, for the most part, agrees.

■ As already noted, on October 20, 1997 and again on November 4, 1997, the City announced its plan for a promotion process that would consist of three stages-the WQT, the Assessment Exercise, and the Merit Component. The City made

---

**12.** On October 26, 1999, the court denied Plaintiffs' motion for class certification (Doc. 69–1), "concluding that Plaintiffs had failed to clearly define the proposed class." The court was concerned, as well, about the fact that the Fraternal Order of Police (FOP) had only reluctantly revealed that it was funding this lawsuit-a case which, in this court's view, "appears to pit the interests of one group of its members against the interests of another group of its members." *Barnhill v. City of Chicago,* No. 98 C 4807, 2000 WL 1222183, at *1 (N.D.Ill. Aug.24, 2000). The court "indicated that it would entertain a renewed motion for class certification, but directed Plaintiffs to clarify the reasons for the class definition they had proffered and to address the court's concerns regarding FOP funding of the lawsuit." *Id.* On November 11, 1999, Plaintiffs filed their renewed motion for class certification. (Doc. 71–1.) On August 24, 2000, the court denied Plaintiffs' renewed motion for class certification because Plaintiffs did not address the concerns expressed by the court in its October 26, 1999 order. *See id.* Plaintiffs appealed this denial to the Seventh Circuit on September 7, 2000. The Seventh Circuit, however, dismissed the appeal on November 29, 2000, for Plaintiffs' failure to comply with the ten-day deadline set forth in Rule 23(f).

clear that a certain percentage of the patrol officers placed on the final promotion list would be taken from the Assessment Eligible List, and the remaining percentage would be taken through the Merit Component. The City then conducted the process according to its previously announced structure. Ultimately, the City combined the Assessment Eligible List and the Merit Component to promote 251 patrol officers to sergeant. One hundred seventy eight (70%) patrol officers were chosen in rank order from the Assessment Eligible List, and the remaining 73(30%) were chosen from the Merit Component.

Plaintiffs were not among the first 178 on the Assessment Eligible List and were not even nominated at the first stage of the Merit Component. Importantly, Plaintiffs here do not allege that they *should* have been nominated or promoted pursuant to the Merit Component, regardless of whether race was considered by the Nominators, the ASB or Superintendent Hillard. Plaintiffs therefore do not have standing to challenge the manner in which the City *executed* the Merit Component of the 1998 Sergeants Exam. *See Erwin v. City of Chicago*, No. 90 C 950, 1998 WL 704295, at *3 (N.D.Ill. Sept.30, 1998) ("A plaintiff who would have been no better off had the defendant refrained from the unlawful acts of which the plaintiff is complaining does not have standing under Article III of the Constitution to challenge those acts in federal court.") (citing *McNamara v. City of Chicago*, 138 F.3d 1219 (7th Cir.1998)). *See also Byers v. City of Albuquerque*, 150 F.3d 1271 (10th Cir. 1998) (non-minority plaintiffs lacked standing to challenge the police department's practices where, even absent the alleged discrimination, plaintiffs would not have been chosen); *Grahek v. City of St. Paul*, 84 F.3d 296 (8th Cir.1996) (same).

As Plaintiffs are quick to point out, though, this does not completely dispose of their case. While Plaintiffs did allege that Superintendent Hillard impermissibly considered racial factors during the third stage of the Merit Component, they have also alleged that the Merit Component, *on the whole*, was developed as a vehicle for affirmative action. The City has admitted in its Answer to Plaintiffs' Fourth Amended Complaint that each Plaintiff would have been one of the 251 patrol officers promoted had the 1998 Sergeant Exam consisted only of the WQT and Assessment Exercise. Accordingly, the court will address Plaintiffs' claims, but only with respect to the limited issue of whether the decision to employ the Merit Component as part of the 1998 Sergeant Exam was driven by a discriminatory intent in violation of the Equal Protection Clause and whether the 1998 Sergeant Exam, *on the whole*, had a discriminatory impact on Caucasians in violation of Title VII.

**B. The Merits**

The court turns, then, to the parties' summary judgment motions. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir. 1999).

**1. Equal Protection**

The court first addresses Plaintiffs' claim that the decision to employ the Merit Component violated their equal protection rights under 42 U.S.C. § 1983.[13] To pre-

---

**13.** The City, citing to *Monell v. Department of*    *Soc. Svcs.,* 436 U.S. 658, 691, 98 S.Ct. 2018,

vail on this equal protection claim, Plaintiffs must demonstrate that the CPD intentionally discriminated against them on the basis of race. If CPD is found to have intentionally discriminated against Plaintiffs, its actions would be subject to strict scrutiny and must be justified by a compelling state interest and narrow tailoring. *See Majeske v. City of Chicago*, 218 F.3d 816, 819 (7th Cir.2000) (citing *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)).

Plaintiffs may attempt to demonstrate intentional discrimination in several ways. *See McCraven v. City of Chicago*, 109 F.Supp.2d 935, 945 (N.D.Ill.2000) (citing *Hayden v. County of Nassau*, 180 F.3d 42, 47 (2d Cir.1999)). First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race. *See Hayden*, 180 F.3d at 47 (citing *Adarand*, 515 U.S. at 213, 227–29, 115 S.Ct. 2097). Second, a law or policy which is facially neutral violates equal protection if it is applied in a discriminatory fashion. *See id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Third, and lastly, a facially neutral law or policy violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect. *See id.* (citing *Village of Arlington Heights v. Metropolitan*

*Housing Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

Plaintiffs have focused on the first of these three methods of proving intentional discrimination-"facial classification." A policy, however, will only be found to involve a "facial classification," when, on its face, it explicitly distinguishes between people on the basis of some protected category. *See Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir.1999). For this reason, Plaintiffs' citations to *Adarand Constructors Inc. v. Peña*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), *Hopwood v. Texas*, 78 F.3d 932, 940 (5th Cir.1996), and *Middleton v. City of Flint*, 92 F.3d 396, 404 (6th Cir.1996) are unhelpful. In *Adarand*, the plaintiff non-minority business challenged a federal affirmative action program which provided incentives for contractors who subcontracted to minority businesses. In *Hopwood*, the non-minority plaintiffs challenged the University of Texas School of Law's practice of lowering the requisite "Texas Index" when considering African–American and Mexican–American applicants. *Id.* at 936. And, in *Middleton*, the non-minority plaintiffs challenged the City of Flint's affirmative action plan which required 50% of all police officers promoted to the rank of sergeant to be members of specified minority groups.[14] Each of these three

56 L.Ed.2d 611 (1978), argues that Plaintiffs cannot state a claim against it under § 1983 because neither the Superintendent of Police nor the members of the ASB are final policymakers. The court finds this argument meritless. According to *Monell*, a municipality such as the City can be found liable under § 1983 if a plaintiff can show that (1) the municipality has an express policy, that when enforced, causes a constitutional deprivation; (2) the municipality has a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; *or* (3) the constitutional injury in question was caused by a

person with final policymaking authority. *See Monell*, 436 U.S. at 690, 98 S.Ct. 2018. Regardless of whether Superintendent Hillard or the ASB members are considered final policymakers for purposes of § 1983, Plaintiffs have satisfied the *Monell* standard by clearly alleging that the City had an express policy, the Merit Component, which was intended to discriminate against Caucasian officers in violation of their Fourteenth Amendment rights.

**14.** Plaintiffs also cite to the case of *Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 862 (9th Cir.1998) for the proposition that a state actor classifies people on the basis of

cases clearly involved "select affirmative action tools, such as quota systems, set-aside programs, and differential scoring cutoffs, which utilize express racial classifications and which prevent non-minorities from competing for specific slots or contracts." *Hayden v. County of Nassau,* 180 F.3d 42, 49 (2d Cir.1999). Here, on the other hand, the Merit Component was not expressly designed to reserve spots for minority candidates. Instead, at least on its face, it was open to candidates of all races and, as a matter of fact, of the 73 patrol officers promoted pursuant to the Merit Component, 43 were Caucasian. Therefore, Plaintiff's "facial classification" argument misses the mark.

The court moves then to the second and third means of proving intentional discrimination. As the court has already noted, though, Plaintiffs do not have standing to challenge the execution of the Merit Component. Consequently, the second method of proving intentional discrimination is unavailable to Plaintiffs. The third method, however, remains a possibility. To prevail under this third approach, Plaintiffs must demonstrate that the Merit Component was the result of discriminatory intent and its implementation resulted in a discriminatory effect. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In order to establish discriminatory intent, Plaintiffs may either present the court with direct evidence or satisfy the burden-shifting system outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Ibarra v. Martin,* 143 F.3d 286, 291 (7th Cir.1998) (citing *Helland v. South Bend Cmty. Sch. Corp.,* 93 F.3d 327, 329 (7th Cir.1996) (§ 1983 discrimination claims, like Title VII claims, may be proven either directly or under the *McDonnell Douglas* framework)).

A direct evidence assertion must be supported by allegations which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Mills v. Health Care Service Corp.,* 171 F.3d 450 (7th Cir. 1999) (quoting *Eiland v. Trinity Hosp.,* 150 F.3d 747, 751 (7th Cir.1998)). Plaintiffs, citing to *Lederer v. Argonaut Ins. Co.,* No. 98 CV 3251, 2000 WL 126933, at *5 (N.D.Ill. Jan.28, 2000), contend that di-

race when it assembles and maintains documentation regarding the racial identity of those under its control for the purposes of making decisions. *See* Plaintiffs' Reply Memorandum in Support of Their Motion for Summary Judgment, at 7. The Chinese–American plaintiffs in *Ho* brought a Fourteenth Amendment claim challenging the San Francisco Unified School District's adherence to an aspect of a 1983 consent decree which required the SFUSD to "monitor the entering classes of all regular schools in which a single racial/ethnic group comprises more than 45% of the student enrollment, to assure that students in that racial/ethnic group will not comprise more than 40% of the entering class at any such school." *Ho,* 147 F.3d at 857. In order to determine race and ethnicity of registering students, SFUSD required all parents/guardians to check one box among thirteen racial/ethnic categories. *Id.* The court ultimately held that questions of fact remained with respect to the fitness of racial quotas as a remedy for vestiges of prior discrimination. *Id.* at 865.

The court finds Plaintiffs' citation to *Ho* unpersuasive for two reasons. First, as discussed further in this Equal Protection section, arguments as to the execution of the Merit Component (here, the ASB's and Superintendent's alleged use of lists with racial information) are irrelevant given this court's finding on standing. Second, while the court in *Ho* did indicate that the required form lent credence to the plaintiffs' "racial/ethnic classification" argument, its finding was made in the context of the quota-driven consent decree. Therefore, as in *Adarand, Hopwood,* and *Middleton,* but not in the case before this court, the challenged practice in *Ho* involved an express classification of people on the basis of race.

rect evidence need not come in the form of an outright admission of discrimination. In *Lederer*, however, the direct evidence cited by the court *was* an outright admission. *See id.* at *5 ("[Defendant] repeatedly stated that the company wanted to hire a man for the Foreign Claims Analyst position."). Superintendent Hillard testified that neither race nor gender played a part in his selection. And, the statements made by ASB members and Superintendent Hillard about efforts to reflect the City's diversity do not rise to the level of direct evidence.

Plaintiffs must therefore rely on circumstantial proof using the burden-shifting system. To be successful under this method of proof, Plaintiffs must first establish a *prima facie* case by demonstrating that: (1) they are members of a protected class; (2) they are otherwise similarly situated to members of the unprotected class; (3) they were treated differently from members of the unprotected class; and (4) their employer acted with discriminatory intent. *See Johnson v. City of Fort Wayne,* 91 F.3d 922 (7th Cir.1996) (citing *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 513 (7th Cir.1993)).[15] Plaintiffs' equal protection argument fails because they cannot demonstrate the requisite discriminatory intent.

Plaintiffs have presented the following evidence for the purpose of establishing discriminatory intent. First, Plaintiffs point to the historical evidence discussed throughout the early portion of this opinion-such as the detective promotions at issue in *Majeske,* the Draft Panel Report which mentioned the practice of affirmative action in hiring, and the hearing before the Task Force-to demonstrate that the City has been using race-conscious promotion practices for nearly 25 years and that the Merit Component was designed to reduce the adverse impact on minorities caused by prior promotion examinations. Second, Plaintiffs claim that *during the execution of the Merit Component* (i) the Nominators utilized unlimited discretion when choosing officers (yet, Plaintiffs have conceded that no discrimination occurred at this stage); (ii) ASB members and the Superintendent had racial information available to them when making their decisions; and (iii) most ASB members and Superintendent Hillard did not receive nomination and diversity training.

As to Plaintiffs' historical evidence, the court does not doubt for an instant that the City had prior examinations in mind when it accepted the recommendation of the Task Force and developed the Merit Component of the 1998 Sergeant Exam. How could it not? Its examinations had been challenged in various fora for over twenty years. The Merit Component was intended as a means of potentially correcting possible testing biases, and leveling the playing field *ex ante.* That does not, however, mean that the City intended to discriminate against Caucasians. The court believes it would be a huge step backwards to label the Merit Component *per se* discriminatory where such a selection process has already been arguably endorsed by an arbitrator, *see Majeske v. City of Chicago,* No. 89 C 7262, 1998 WL 312016, at *2 (N.D.Ill. June 4, 1998) (noting that Arbitrator Anthony V. Sinicropi found that

---

**15.** If Plaintiffs make out a *prima facie* case of discrimination, the burden then shifts to the City to articulate a legitimate non-discriminatory reason for taking the action alleged by Plaintiffs to be discriminatory. *See Johnson v. City of Fort Wayne,* 91 F.3d 922 (7th Cir. 1996). Finally, if the City succeeds in meeting this burden, the burden shifts back to Plaintiffs to demonstrate that the proffered reason is merely a pretext for discrimination. *Id.*

"the merit procedures utilized by the [City] do not violate the language of the agreement . . . ."), a state court, *see Nolan v. Hillard,* 309 Ill.App.3d 129, 242 Ill.Dec. 952, 722 N.E.2d 736 (1st Dist.1999) ("assuming Jaconetti did have standing, his challenge would fail in light of the express language contained in section 1 of Rule X, which explicitly allows [Department of Personnel] to consider merit as a basis for making promotions."), and a federal court, *see Brown II,* 8 F.Supp.2d 1095, 1110 (finding a merit selection process to be an equally valid, less discriminatory method for promotion than a straight multiple-choice testing device that would have an adverse impact on minorities). Thus, Plaintiffs' evidence that the City opted for the Merit Component in order to reduce the adverse impact of prior examinations on minorities does not sway this court. The Court of Appeals for the Second Circuit was similarly unmoved: In *Hayden v. County of Nassau,* 180 F.3d 42, 51 (2d Cir.1999), the court affirmed the dismissal of an equal protection claim brought by 68 white, Latino, and female applicants, concluding that the County's deliberate attempt to minimize the adverse impact of an entrance examination against African–American candidates did not constitute intentional discrimination. *See Hayden,* 180 F.3d at 51 ("Nothing suggests that the County sought to disadvantage appellants, or that the County was propelled by sinister or invidious motivations. A desire to reduce the adverse impact on black applicants and rectify hiring practices which the County admitted in the 1982 consent order might support an inference of discrimination is not analogous to an intent to dis-

criminate against non-minority candidates.").

All that is left of Plaintiffs' intentional discrimination claim, then, is the evidence offered by Plaintiffs concerning execution, as opposed to development, of the Merit Component. *See* Memorandum of Law in Response to Defendant's Motion for Summary Judgment ("Plaintiffs' Memorandum in Response"), at 10 ("The City's violation occurred only when it factored race into its promotional decisions in a manner that placed Caucasian candidates on competitive disadvantage vis-a-vis African–American candidates."). Given its finding on standing, however, the court will not evaluate this evidence. Whether the ASB members or Superintendent Hillard ultimately chose candidates based on their race, for example, had absolutely no impact on Plaintiffs, who freely admit that they were not worthy of promotion based on merit. Because Plaintiffs have failed to create a dispute of material fact on the critical issue of intent, the court does not need to decide whether the City had a compelling interest to include a Merit Component in its 1998 Sergeant Exam or whether the Merit Component was narrowly tailored to effectuate such a compelling interest.[16]

### 2. Title VII: Adverse Impact

Plaintiffs also claim that the City violated Title VII because the Merit Component was an invalid, discriminatory selection device that had an adverse impact on Caucasian males. *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment, at 12. The disparate impact theory of Title VII liability

---

**16.** In reaching this conclusion, the court does not decide whether the Merit Component was *executed* within the boundaries of federal discrimination law. It nevertheless notes that certain aspects of this execution (e.g., the creation and distribution of the "Female and

Minority Nominees for Merit Sergeant Positions" list and the sudden addition of Officers Villalobos and Brown to the list ultimately forwarded to Superintendent Hillard) are undoubtedly troublesome.

may be utilized to challenge subjective selection processes such as the Merit Component. *See Watkins v. City of Chicago,* 73 F.Supp.2d 944, 948 (N.D.Ill.1999) (citing *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 513 (7th Cir.1996)). To establish a prima facie case under a disparate impact theory, "Plaintiffs must: (1) identify the employment practice giving rise to the statistical disparity; and (2) demonstrate causation by offering 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group.' " *McCraven v. City of Chicago,* 109 F.Supp.2d 935, 944 (N.D.Ill.2000) (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). *See also Vitug,* 88 F.3d at 513 ("Under a disparate impact theory of discrimination, a plaintiff may successfully attack a subjective and arbitrary hiring procedure only if it has a disproportionately negative effect on members of a protected class. Put simply, success under a disparate impact theory of discrimination requires a showing of disparate impact.").[17]

█ In order to establish adverse impact, Plaintiffs have offered the expert testimony of Dr. Cramer. In his report, Dr. Cramer seizes upon the "eighty percent rule" of the Uniform Guidelines on Employee Selection Procedures adopted by the Equal Employment Opportunity Commission. *See* 29 C.F.R. § 1607.4(D). The "eighty percent rule" provides that "[a] selection rate for any race ... which is less than four-fifths (⅘) (or 80%) of the rate for the group with the highest rate will generally be regarded ... as evidence of adverse impact." *Id.* Dr. Cramer notes that, at the third stage of the Merit Component, "the Superintendent chose 60.5% of the African–American candidates forwarded to him by the ASB (23 out of 38 candidates), but only chose 44.9% of the Caucasian candidates forwarded to him (40 out of 89)."[18] *See* Plaintiffs' Memorandum of Law in Response to Defendant's Motion for Summary Judgment. This translates to a selection rate for Caucasians that is only 74% of the rate for African–Americans.

The City counters with Dr. McPhail's statistical analysis. Dr. McPhail does not address the EEOC's "eighty percent rule," but instead challenges the potency of Dr. Cramer's p-value calculation. Dr. McPhail points out that while a p-value of .05 *or less* is usually considered statistically significant, Dr. Cramer obtained a p-value of .078. Moreover, Dr. McPhail notes, Dr. Cramer achieved his .078 result by way of a "one-tailed" test, a less conservative standard of measurement that assumes any differences between the observed results and those that would be expected by chance will be differences in one direction only. *See Dicker v. Allstate,* No. 89 C 4982, 1997 WL 182290, at *39–40 (N.D.Ill.

---

17. If Plaintiffs establish a *prima facie* case, "the burden then shifts to the City to prove that the 'hiring methods responsible for the disparity are necessary to the efficient conduct of [its] business.' " *McCraven v. City of Chicago,* 109 F.Supp.2d 935, 944 (N.D.Ill. 2000) (quoting *Robinson v. Sheriff of Cook County,* 167 F.3d 1155, 1156 (7th Cir.1999)). Finally, if the City meets that burden, the burden shifts back to Plaintiffs who must prove that there was an available, equally valid, less discriminatory method for pro-

motion that the employer refused to use. *See Bryant v. City of Chicago,* 200 F.3d 1092, 1094 (7th Cir.2000).

18. Despite the fact that Count II of Plaintiffs' Fourth Amended Complaint states that the Merit Component had an adverse impact on Caucasian *males,* Dr. Cramer's adverse impact analysis does not differentiate between male and female Caucasian candidates.

Apr.9, 1997) (citing *Palmer v. Shultz*, 815 F.2d 84 (D.C.Cir.1987)). In other words, here, the assumption of the one-tailed test is that the only unfairness in the Merit Component was against Caucasians. Such a test, however, is clearly inappropriate in a "reverse discrimination" context: even though decision makers may take affirmative steps to eradicate discrimination against minorities, the assumption that such discrimination no longer exists at all is naive. A "two-tailed" test, which assesses the likelihood that *any* differences between two groups would occur by chance, *see Dicker*, 1997 WL 182290, at *40, would have yielded a p-value of approximately .124. In addition, Dr. McPhail determined that the "z-value" for African–Americans chosen by the Superintendent was 1 .409, well below the 1.96 "z-value" minimum threshold for statistical significance.

The court highlights these statistical analyses and corresponding arguments only to show the parties that it has duly considered them, not because they have any significance in this particular case. In light of this court's finding on standing, Plaintiffs cannot challenge the mechanics of the Merit Component's third stage. Consequently, Plaintiffs may only demonstrate any alleged adverse effect on them by providing the court with a convincing, statistical comparison of promotions as they occurred in August 1998 to the promotions *as they would have occurred* had the 251 patrol officers been selected in rank order from the Assessment Eligible List. The court has gleaned the following from the parties' submissions: (1) if the City had promoted in rank order based on the written assessment exercise alone, the percentages of those promoted would have been 77% Caucasian, 15% African–American, 6% Hispanic, and 1% Other; and (2) because it did not, the result was 72% Caucasian, 19% African–American, 8% Hispanic, and 1% Other. *See* Plaintiffs'

Reply Brief at 12. On their face, these numbers do not offend this court. More importantly, however, Plaintiffs have not provided the court with an analysis of these numbers so as to demonstrate why these numbers should be considered offensive. Absent relevant evidence that Plaintiffs, as Caucasian males, were significantly and discriminatorily impacted by the inclusion of the Merit Component in the 1998 Sergeant Exam, Plaintiffs' Title VII claim fails as a matter of law.

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiffs' equal protection and Title VII claims is granted. Plaintiffs' motion for summary judgment (Doc. 96–1) on these same claims is therefore denied. The City's motion to strike (Doc. 117–1) is also denied.